UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


UNITED STATES OF AMERICA ex rel.  )
CHARLES McLAURIN,                      )
                                          )
                Petitioner,     )
                                          )
    vs.                             )         07 C 1705
                                          )
TERRY McCANN, Warden,        )
                                          )
                Respondent.    )


## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter comes before the Court on Petitioner Charles McLaurin's Petition for Writ of Habeas Corpus. For the following reasons, the petition is denied.

## BACKGROUND

On August 16, 1992, Sauk Village firefighters discovered the body of Jarrell Edwards in a room on the second floor of his house. A piece of cloth was wrapped around Jarrell's head. The house had burned from a fire intentionally started with gasoline. The firefighters noticed surgical gloves at the top of the stairs, and a pattern of flammable liquid spread out on the floor leading from the room where Jarrell was found down the hallway. The burn patterns and charring in the house indicated that

flammable liquid had been poured on Jarrell and then into the upstairs hallway. The fire was initially ignited in the hallway and then spread to the room where Jarrell was found.

Medical testimony at the trial explained that prior to the fire, Jarrell had five wounds, made with a sharp instrument, on his chest, abdomen, neck, cheek, and chin. Evidence indicated that Jarrell was alive when the fire started. Jarrell's body was severely burned and the most likely cause of death was carbon monoxide poisoning as a result of smoke inhalation.

Several items were stolen from Jarrell's home before the fire: two VCRs, two 13-inch television sets, some jewelry, a 12-gauge shotgun, Jarrell's clothing and gym shoes, and his mother's 1987 Chevrolet Celebrity automobile.

At trial, McLaurin's sister, Carla, testified that on the morning of August 16 or 17, she discovered two 13-inch televisions and two VCRs on her enclosed back porch. Later that day, the televisions and VCRs had disappeared from her porch.

Donna Bankston, a Sauk Village police officer, saw McLaurin driving the stolen Chevrolet. According to Bankston's trial testimony, while on patrol and stopped at a red light, she noticed a Chevrolet, also stopped at the light. Shortly thereafter, she heard a radio dispatch from the Sauk Village police department to the effect that they were looking for a blue, two-door Chevy Celebrity with a male black

driver. Bankston's account was contradicted in some respects by Chief Cranston, who recalled that when he arrived to secure the car in response to Bankston's report, Bankston told him that she had noticed the Chevy because it had been traveling at a high rate of speed. She attempted to stop the car, but did not pursue it.

Four months later, on January 13, 1993, Delshea Ingram, McLaurin's girlfriend or wife, walked into a police station in Minneapolis after an argument with McLaurin and told the police officers about the August 16 murder in Sauk Village. During McLaurin's trial, Ingram admitted to telling the Minneapolis police and the Cook County grand jury different versions of how Jarrell was murdered in an effort to protect herself and conceal her involvement. The State's Attorney's office charged Ingram with first degree murder in the death of Jarrell Edwards. Ingram also testified that she had entered into an agreement with the State's Attorney's office for her truthful testimony concerning what happened on the night of Jarrell's murder in exchange for her plea of guilty and a twenty-year term of imprisonment. Ingram was examined concerning her plea agreement and her prior inconsistent statements. Further, an Assistant State's Attorney testified that Ingram had told him, before testifying to the grand jury, that she had left the house before she heard Jarrell scream.

Ingram testified at trial that she first met McLaurin in June of 1992 and married him on July 16, 1992. She met Jarrell Edwards the day before he died. Jarrell had

flirted with Ingram, talking for about 15 minutes, and then invited her to a party he was planning to have while his parents were out of town. At 9 p.m. that evening, she told McLaurin's sister, Carolyn, that she was leaving to go to the store to buy cigarettes but went instead to Jarrell's house. She chatted with him for about a half an hour and then returned to Carolyn's house.

Later that night, a man whom Ingram did not know and whose identity she never learned, came to visit McLaurin at the house. The three of them discussed robbing Jarrell's house in order to obtain money so she and McLaurin could move out of Carolyn's house. The three planned that she would go to Jarrell's house and leave the door unlocked. She rang Jarrell's doorbell after midnight, and she and Jarrell went to his bedroom and talked for about 15 minutes. She asked to use the bathroom, and because she was "stalling for time" stayed in the bathroom for about 5 minutes. When she emerged from the bathroom, she saw the light go out in Jarrell's bedroom and the basement. She heard McLaurin's voice from the bedroom, telling her to leave the house. However, McLaurin's friend grabbed her, led her to the bedroom, and put the light on, at which time she saw Jarrell sitting on a wooden chair, unclothed, with his hands tied around his back and a scarf tied around his mouth. Ingram testified that McLaurin walked in front of Jarrell and asked him whether he would call police if McLaurin let him go. When Jarrell responded yes, McLaurin cut him on the chest

with a straight razor several times. McLaurin removed the fabric tied around Jarrell's mouth and asked if Jarrell had any last words. According to Ingram, Jarrell pleaded for his life. McLaurin replaced the fabric and doused him with gasoline. McLaurin took a match from his pocket, and set Jarrell on fire. Ingram noticed that he had been wearing surgical gloves. Ingram then ran out of the house, and returned to Carolyn's without calling the police, an ambulance, or anyone. Ingram next saw McLaurin around 10 or 11 in the morning, sleeping on a couch in the front room of Carolyn's house. McLaurin told her that if anyone ever found out what happened to Jarrell, he would kill her, her three children, and her mother. Ingram further testified that two weeks later, she and McLaurin moved to Minneapolis and began using aliases.

McLaurin's witnesses told a different story. His sister, Carolyn, testified that on August 16, she was at home with others, including McLaurin and Ingram, drinking and watching movies. No one left the house that night with the exception of Ingram.

McLaurin testified on his own behalf, denying having left Carolyn's house on the evening of August 16. Further, he explained that he took a new name in Minnesota because there were some people there whom he knew from Chicago, and he did not want to be around them anymore. He thought that if they bothered him, he would just tell them that they had gotten him confused with someone else.

Following a 1996 jury trial in the Circuit Court of Cook County, Illinois, McLaurin was convicted of first degree murder, felony murder, home invasion, aggravated arson, residential burglary, and possession of a stolen motor vehicle. McLaurin represented himself during the guilt phase of the trial but requested that counsel be appointed for the sentencing phase. After waiving his right to a jury for the sentencing phase and the completion of a bench trial, McLaurin was sentenced to death for first degree murder and given concurrent sentences of 60 years in prison for home invasion, 30 years for aggravated arson, 15 years for residential burglary, and 7 years for possession of a stolen motor vehicle. He appealed his conviction; and ultimately, the Illinois Supreme Court, on September 24, 1998, affirmed his convictions on all counts with the exception of the residential burglary count and the aggravated arson count, which the Court held were lesser included offenses of home invasion and first degree murder, respectively. In 2003, McLaurin's sentence of death was commuted to life imprisonment by the then-governor of Illinois, George Ryan.

McLaurin filed a petition for post-conviction review in the Illinois Circuit Court on May 28, 1997, before he had exhausted his avenues of direct review, and counsel was appointed. The record is not clear as to why McLaurin's petition remained "pending" from 1997 to 2003, but it appears the case was not dismissed; on

April 11, 2003, counsel filed a second amended petition for post-conviction review in the Illinois Circuit Court. The Circuit Court dismissed McLaurin's petition, and McLaurin appealed. On December 14, 2005, the Illinois Appellate Court affirmed the dismissal of his petition, and on March 29, 2006, the Illinois Supreme Court denied McLaurin's petition for leave to appeal. McLaurin mailed the instant petition for writ of habeas corpus to this court on March 24, 2007. The matter is now fully briefed and we are in possession of the record.

## LEGAL STANDARD

District courts are empowered by 28 U.S.C. § 2254 to entertain writs of habeas corpus on behalf of state prisoners on the ground that they are imprisoned in violation of the Constitution or laws or treaties of the United States. Review by federal courts is appropriate only when a prisoner has exhausted his challenges to his conviction in the state courts. § 2254(b)(1)(A).

The Antiterrorism and Effective Death Penalty Act ("AEDPA") as codified in 28 U.S.C. § 2254, defines the scope of federal court review of state convictions, limiting such review to claims not adjudicated on the merits in state court unless the state court's adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on

an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. § 2254(d); *e.g. Guest v. McCann*, 474 F.3d 926, 931 (7th Cir. 2006) (noting the deference to state court decisions required by AEDPA). A decision is considered "contrary to...clearly established Federal law" if "the state court either 'applies a rule that contradicts the governing law' set forth by the Supreme Court or decides a case differently than the Supreme Court has on materially indistinguishable facts." *McDowell v. Kingston*, 497 F.3d 757,759 (7th Cir. 2007) *citing Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state has not unreasonably applied Federal law unless the application is more than incorrect and instead lies "well outside the boundaries of permissible differences of opinion." *Gilbert v. Merchant*, 488 F.3d 780, 790 (7th Cir. 2007) (internal citations omitted). Furthermore, the state court's determination of factual issues is presumed correct, and the petitioner may only rebut that presumption by clear and convincing evidence. § 2254(e)(1); *Amerson v. Farrey*, 492 F.3d 848, 852 (7th Cir. 2007).

With these legal principles in mind, we consider the instant motion.

## DISCUSSION

While McLaurin's habeas petition sets out eighteen grounds supporting his claim that he is imprisoned in violation of the Constitution, his memorandum in support of his motion only argues nine. Because undeveloped arguments are waived,

we will confine our examination to those nine grounds. *U.S. v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006).

First, McLaurin argues that the state failed to prove his guilt beyond a reasonable doubt. Second, he argues that the trial court inappropriately required him to describe the testimony of several witnesses before ultimately determining that it would not compel their attendance. Third, he argues that he was improperly impeached with two felony convictions more than ten years old. Fourth, he complains that the trial court assumed the role of an advocate in questioning a State witness. Fifth, he was improperly permitted to represent himself at trial, and in a related ground, argues that his waiver of trial counsel was involuntary and unknowing. Next, he raises several grounds with respect to the factors considered at his sentencing: that the State improperly sought the death penalty at trial after offering McLaurin a prison sentence if he pled guilty; that the sentencing court improperly relied on an aggravating factor that had not been enacted by the legislature at the time of the offense. Finally, he argues that newly discovered evidence raises a reasonable doubt as to McLaurin's guilt.

Before we can consider McLaurin's claims on the merits, we must ensure that his claims were fully and fairly presented to the state courts, as 28 U.S.C. § 2254(b)(1)(A) requires that a prisoner must first exhaust his challenges to his

conviction within the state courts. An applicant has "exhausted the remedies available in the courts of the State...if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

The requirement of exhaustion, designed to further comity between the state and federal courts, ensures that the state courts have a full and fair opportunity to examine and decide the constitutional issues before federal courts intervene. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999). A full opportunity to review the constitutional issues means that the prisoner must raise the issues both in his appeal in the appellate court and in his petition for leave to appeal to the Illinois Supreme Court. *O'Sullivan*, 526 U.S. at 845-46. A fair opportunity to review the constitutional issues means that the issues must have been fairly presented to each state court in a substantive and meaningful fashion such that the court is "alerted" to the federal nature of the claim. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

In considering whether a prisoner has set forth the operative facts and legal theories sufficient to alert the state courts as to the nature of his constitutional claims, a district court must examine:

> 1) whether the petitioner relied on federal cases that engage in a constitutional analysis; 2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a

pattern of facts that is well within the mainstream of constitutional litigation.

*Harrison v. McBride*, 428 F.3d 652, 661 (7th Cir. 2005) (internal citations omitted).

Both McLaurin and McCann agree that McLaurin's current claims have been exhausted. We confirm that McLaurin previously sought a remedy in state court for the federal claims he now brings and turn our attention to the merits of his contentions.

## A.     Failure to Prove Guilt Beyond a Reasonable Doubt

McLaurin argues that the State's case rested almost entirely on Ingram because she agreed to testify against him in exchange for a prison sentence of twenty years. Not only is Ingram's testimony inherently unreliable, McLaurin argues, it is also not corroborated by the physical evidence and is contradicted by other testimony. Further, McLaurin argues that Bankston, who identified him as driving Jarrell's parents' car, changed her story and lied in order to incriminate him.

McLaurin initially raised this claim on direct review, and the Illinois Supreme Court concluded that Ingram's testimony was corroborated by the majority of the physical evidence and that his plea deal was adequately presented to the jury, along with a special instruction on the believability of cooperating witnesses, so that the jury made a full and informed assessment of her credibility. The Illinois Supreme

Court reviewed the evidence under the standard enunciated in *People v. Oaks*, 662 N.E.2d 1328 (1996), which requires affirmation of the conviction unless "no rational trier of fact" could have made that finding.

The state standard is consistent with our standard for granting habeas corpus relief. That is, McLaurin would only be "'entitled to habeas corpus relief if it [wa]s found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'" *Cabrera v. Hinsley*, 324 F.3d 527, 533. Taking the evidence in the light most favorable to the prosecution, it is clear that a reasonable jury could have found McLaurin guilty because evidence at trial placed him at the scene of the crime and in the victim's stolen car. Further, the trial judge's instructions to the jury that it could rely on accomplice testimony despite its inherent weakness is consistent with McLaurin's convictions. Therefore, the Illinois Supreme Court determination that a rational trier of fact could have found McLaurin guilty beyond a reasonable doubt was neither contrary to established Federal law, nor based on an unreasonable determination of facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254 (d)(1). Accordingly, McLaurin is not entitled to relief on this claim.

## B.     Requiring Petitioner to Proffer the Expected Testimony of Certain Defense Witnesses and Failing to Compel their Presence

McLaurin next asserts that his Fourth and Sixth Amendment rights were violated by the trial court when it failed to compel the presence of the following defense witnesses: Geraldine Patterson; Zachary Scruggs; Lionel Jones; Gerald Johnson; Christina Johnson; Regina Davis; and Patricia Favors. McLaurin also takes issue with the fact that the court required him to summarize the testimony of each of these witnesses before determining whether or not to compel their presence. Upon hearing that these witnesses would act as collateral witnesses and not material witnesses, the court chose not to compel their presence in court.

The Illinois Supreme Court reviewed the trial judge's questions to McLaurin about these witnesses and found them to be neither arbitrary nor erroneous. The court also found that the proposed testimony was immaterial to raising a reasonable doubt as to McLaurin's guilt. There can be "no violation of the accused's rights...unless the potential witnesses could have provided relevant and material testimony for the defense." *U.S. v. Verkuilen*, 690 F.2d 648, 659 (7th Cir. 1982). McLaurin wished to call upon these witnesses to demonstrate that Ingram was not well-liked and lacked credibility, and that McLaurin used his birth name while he was in Minnesota. Such testimony was irrelevant to McLaurin's defense because it would not tend to show

that McLaurin did not commit robbery, arson, or murder. As such, McLaurin's Sixth Amendment rights were not violated when the trial judge prevented McLaurin from calling these witnesses because none of the witnesses were critical to McLaurin's defense. Consequently, McLaurin's claims do not warrant habeas relief.

## C.    Admittance of McLaurin's Two Felony Convictions

McLaurin next contends that had the State not been able to impeach him with the following two convictions, the jury would have believed his assertion of innocence: 1) a plea of guilty to the offense of possession of a stolen motor vehicle on October 12, 1983, and 2) a plea of guilty to the offense of burglary on October 30, 1984. This ground is not a proper vehicle for seeking habeas relief because the trial court's admission of this evidence concerns an error of state law. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Therefore, habeas relief is not appropriate.

## D.    Questioning of Witnesses by Trial Judge

McLaurin next argues that the trial court denied him his due process rights by assuming the role of an advocate during his trial and rehabilitating the credibility of Dr. Donoghue, the Chief Medical Examiner of Cook County. Dr. Donoghue testified about his external examination of the decedent and his belief that the decedent had died of carbon monoxide intoxication from the inhalation of smoke. When McLaurin cross-examined Dr. Donoghue, he asked him several questions about an autopsy

report another doctor had written. At times during McLaurin's questioning, Dr. Donoghue replied that he did not understand what McLaurin was asking him. Then, at one point Dr. Donoghue explained that the autopsy report McLaurin was asking him about was consistent with Dr. Donoghue's own findings. After McLaurin was done questioning Dr. Donoghue, the trial judge asked him four questions: 1) if his opinion regarding the decedent's cause of death was as he testified to on direct, to which Dr. Donoghue answered, yes, 2) if there existed other autopsy reports concerning the decedent, to which Dr. Donoghue answered, no; 3) if Dr. Donoghue creates a report every time he speaks with a person regarding his findings, to which Dr. Donoghue answered, no; and 4) if he could clarify how deep the cut on the right side of the decedent's neck was, to which Dr. Donoghue answered "about a quarter of an inch." Upon considering this claim, the Illinois Supreme Court said that its "examination of the record reveal[ed] that this contention [wa]s without merit" and that the record reflected that the trial judge was attempting to clarify the witness's testimony. *McLaurin,* 184 Ill.2d at 91.

A trial judge may ask questions of a witness in order to make the witness's testimony clearer. *Ross v. Black & Decker, Inc.*, 977 F.2d 1178, 1187 (7th Cir. 1992). Such questioning of a witness is not contrary to a trial judge's duty to act impartial. *Ross*, 977 F.2d at 1187. The record reveals that the trial judge's brief questioning of

Dr. Donoghue served only to clarify any confusion surrounding Dr. Donoghue's findings and did not rehabilitate Dr. Donoghue as a witness. The Illinois Supreme Court's findings surrounding McLaurin's claim were neither contrary to established Federal law, nor based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254 (d)(1). Therefore, McLaurin's claim does not warrant habeas relief.

### E.    McLaurin's Self-Representation

McLaurin contends that his Sixth and Eighth Amendment rights were violated by the trial court when it allowed him to represent himself and that his waiver of counsel was neither voluntary nor knowing. McLaurin presented these same arguments in his post-conviction petition to the appellate court. Upon hearing these arguments, the appellate court held that McLaurin's failure to raise such claims on direct appeal forfeited his right to assert them in his post-conviction petition:

> [I]ssues that were not raised on direct appeal, but could have been, are barred by waiver...[I]n his direct appeal, the supreme court found "[McLaurin] makes no claim, nor does the record suggest, that his decision to represent himself was made other than freely, knowingly, and intelligently." We therefore agree with the State's contention that this issue is waived for post-conviction purposes.

The appellate court also explained that "even if [it] were to decide with [McLaurin's] contention that his claim is not barred...[McLaurin] fails to establish a substantial showing of a constitutional violation."

When a federal habeas petitioner fails to raise a federal or constitutional claim on appeal to the state's highest court, the claim is considered to be procedurally defaulted. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). This court may not review procedurally defaulted claims. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). The Illinois Supreme Court found that McLaurin's self-representation claims had been procedurally defaulted because he failed to raise them on direct appeal. In order to excuse his procedurally defaulted claim, McLaurin would have had to demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law," or that our failure to consider the claims would result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). McLaurin has failed to state an objective reason for his failure to present his claim on direct appeal. He has also failed to demonstrate that his is an "extraordinary case, where a constitutional violation has probably resulted in [his] conviction." *Schlup v. Delo*, 513 U.S. 298, 321 (1995). As such, McLaurin's procedurally defaulted claims do not merit habeas relief.

### F. State's Decision to Seek the Death Penalty

McLaurin next asserts that his Eighth and Fourteenth Amendment rights were violated by the State's decision to seek the death penalty at trial, after first offering McLaurin a plea for a term of years. When the Illinois Supreme Court considered McLaurin's claim, it found it to lack any merit. The record reflects that McLaurin knew that the death penalty was a possible sentence if he chose to take his case to trial. Making an offer for a term of years in a plea agreement does not prohibit the state from later seeking the death penalty at trial. *People v. Lewis*, 430 N.E.2d 1346, 1354 (Ill. 1981); *see also Corcoran v. Buss*, 483 F.Supp.2d 709, 721 (N.D. Ind. 2007) ("It is well within prosecutorial discretion to offer to waive the death penalty in exchange for a guilty plea."). As such, the Illinois Supreme Court's consideration of McLaurin's claim was not contrary to established Federal law. 28 U.S.C. § 2254 (d)(1). Therefore, this claim does not warrant habeas relief.

### G. Consideration of Aggravating Factors at Sentencing

McLaurin also claims that the trial court erred when it considered his eligibility for the death penalty because it applied the infliction of torture statutory aggravating factor, which had not yet been enacted by the legislature at the time of the offense. The Illinois Supreme Court agreed with McLaurin that the infliction of torture aggravating factor had not been enacted by the legislature at the time of the crime and

that his convictions for residential burglary and aggravated arson would be vacated. Despite this determination, the court found the trial court's holding of death eligibility to be correct because, in addition to the challenged aggravating factor, the trial court relied on valid "cold, calculated, and premeditated" aggravating factors. The Illinois Supreme Court also held that the trial court did not base its determination on any inappropriate aggravating factors in deciding that death was an appropriate penalty: "The remarks of the trial court make clear that, in determining that there were no mitigating factors sufficient to preclude the imposition of a death sentence in this case, the court did not rely on the statutory aggravating factor of the infliction of torture."

When McLaurin was sentenced, Illinois was considered to be a "non-weighing state." "In a nonweighing State, so long as the sentencing body finds at lease one valid aggravating factor, the fact that it also finds an invalid aggravating factor does not infect the formal process of deciding whether death is an appropriate penalty." *Stringer v. Black*, 503 U.S. 222, 232 (1992) *quoted* i*n Hough v. Anderson*, 272 F.3d 878, 905 (7th Cir. 2001). Because the sentencing body in the present case found the valid "cold, calculated, and premeditated" aggravating factors, the fact that it also found an invalid aggravating factor did not taint its determination that McLaurin was eligible for the death penalty. As such, the Illinois Supreme Court's decision

regarding McLaurin's claim was neither contrary to established Federal law, nor was it based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254 (d)(1). As such, this claim does not warrant habeas relief.

### H.    Newly Discovered Evidence Demonstrates McLaurin's Innocence

McLaurin's final argument is that newly discovered evidence raises a reasonable doubt of his guilt.   Such a claim, which presents "newly discovered evidence that bears only on the question of guilt or innocence is not reviewable by a federal court on a motion for habeas corpus relief" unless the evidence is so compelling that it would be a violation of "'fundamental fairness embodied in the Due Process Clause'" not to consider it. *Coogan v. McCaughtry*, 958 F.2d 793, 801 (7th Cir. 1992).  McLaurin presents three affidavits as newly discovered evidence: 1) his own affidavit, 2) the affidavit of Sharon McCary, and 3) the affidavit of Wayne Ogrodowski.  By his own admission, McLaurin presented these same affidavits in an actual innocence claim in his Amended Petition for post-conviction Relief.

The state court reviewed the information in these three affidavits.  McLaurin's affidavit stated that he was playing cards at McCary's home during the night of August 15, 1992, when he received a call from his girlfriend, Dee, asking him to pick her up at a party.  Ogrodowski drove McLaurin to the party and dropped him off.

Once at the party, McLaurin went upstairs and saw "Tutu" with a gun standing over Jarrell, who was tied up. McLaurin stated further that he also saw a "big wet spot" around Jarrell, and that Dee threw a match onto Jarrell and that "the room just went up in flames."

In McCary's affidavit, she stated that she was McLaurin's close friend and that on the night of August 15, 1992, McLaurin was playing cards at her house. McCary stated that after 10:00 p.m., McLaurin received a call from "Dee Dee," a woman he was dating. Following the phone call, McLaurin told McCary, "[T]hat dumb bitch, she done got into some shit" and left McCary's house in Ogrodowski's car.

In Ogrodowski's affidavit, he stated that he was pretty good friends with McLaurin and that he recalled dropping McLaurin off near Jarrell's house some night during the summer of 1992.

After evaluating these affidavits, the state court rejected McLaurin's actual innocence claim:

> The evidence presented through the affidavits attached to [McLaurin's] petition is not "new", as his own testimony as well as testimony from McCary and Ogrodowski was available at the time of trial. Further, the evidence is not of such a conclusive character that the result on retrial would be different, as neither McCary nor Ogrodowski indicate any knowledge of what occurred at the scene of the murder. [McLaurin's] own self-serving statement that he did not commit the crime is also far from conclusive of his innocence.

We concur with the state court's findings regarding the three affidavits. These affidavits do not constitute newly discovered evidence, nor are they so compelling that a violation of fundamental fairness embodied in due process would result if McLaurin was not granted a new trial. McLaurin could have called these witnesses or presented these affidavits during his trial but failed to do so. Even if he had, McCary and Ogrodowski's affidavits do not shed light on McLaurin's innocence, but rather support McLaurin's guilt. The affidavits place McLaurin in Jarrell's home during the murder and contradict McLaurin's trial testimony that he did not leave Carolyn's house on August 15, 1992. Therefore, habeas relief is not warranted.

## CONCLUSION

Based on the foregoing analysis, McLaurin's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied.

_____
Charles P. Kocoras
United States District Judge

Dated:  November 15, 2007